# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

JERRY L. LOCKETT,           )
                                  )
       Plaintiff,            )
                                  )
       v.                   )       CAUSE NO.: 1:07-CV-270-TS
                                  )
THE BOARD OF COMMISSIONER  )
OF THE COUNTY OF ALLEN, and   )
THE ALLEN COUNTY HIGHWAY   )
DEPARTMENT,             )
                                  )
       Defendants.          )

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 21] filed by the

Defendants on January 16, 2009.

## BACKGROUND

On November 1, 2007, the Plaintiff, Jerry L. Lockett, sued his former employer, the

Allen County Highway Department. The Complaint also names the Board of Commissioners of

the County of Allen, which is the county executive for Allen County, Indiana, and the entity that

created the Highway Department. The Plaintiff's Complaint and Demand for Jury Trial asserts

claims for relief under the following federal statutes: the Americans with Disabilities Act (ADA)

of 1990, 42 U.S.C. § 12101 *et seq.*; Title VII of the Civil Rights Act of 1964, as amended (Title

VII), 42 U.S.C. § 2000e *et seq.*; and 42 U.S.C. § 1981. The Plaintiff alleges that the Defendants

violated the ADA when they failed to adequately engage in the interactive process and did not

provide a reasonable accommodation for his disability. He alleges that the termination of his

employment was a violation of the ADA and discrimination against him on the basis of his race

in violation of Title VII and § 1981. The Defendants answered the Complaint on December 20, 2007.

On January 16, 2009, the Defendants filed their Motion for Summary Judgment [DE 21], along with a Memorandum of Law in Support of Motion for Summary Judgment [DE 22] and an Appendix [DE 23]. On March 5, the Plaintiff filed his Response to Defendants' Motion for Summary Judgment [DE 26] and an Appendix [DE 27], and on March 27, the Defendants filed their Reply Memorandum in Support of Motion for Summary Judgment [DE 28].

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th

Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a

summary judgment motion construes all facts in the light most favorable to the nonmoving party

and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609.

However, the court is not required to draw every conceivable inference from the record—only

reasonable ones. *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989).

Pursuant to a local rule governing summary judgment motions filed in this judicial

district, the Court is to assume that the facts claimed by the moving party and supported by

admissible evidence are admitted to exist without controversy, except to the extent such facts are

controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported

by admissible evidence. N.D. Ind. L.R. 56.1(b).


## STATEMENT OF FACTS

Allen County Highway Department maintenance workers perform tasks related to the

construction, maintenance, and repair of Allen County's highways, roads, and ditches. The

Highway Department recognizes three classifications of maintenance workers, which are

designated as Maintenance-I, Maintenance-II, and Maintenance-III.  Employees in the highest

classification, Maintenance-I, are required to have a current Class A Commercial Driver's

License. They operate a wide variety of trucks and heavy machinery to perform their

construction and maintenance duties. The lower classification workers perform more light

equipment and manual work than the Maintenance-I workers. Although Maintenance-I is the

highest classification, Maintenance-I workers are required, per the Defendants' written job

description, to perform the duties of the other two classifications as situations require or as

directed by supervisors.

Between 1996 and 2006, budget restrictions led to the elimination of many Maintenance-II and III positions, and to less construction and more road repair and maintenance work being performed. During road construction, Maintenance-I workers typically spend a significant amount of time inside their truck cabs as they haul stone and other materials to and from the construction sites. Road repair and maintenance, by comparison, requires more labor intensive tasks, such as trimming trees, cutting brush, and filling pot holes. Because the majority of maintenance workers had achieved the Maintenance-I level, but most of the work required less truck driving and more manual field work, supervisors began directing Maintenance-I workers to rotate through all of the functions of their position and the lower maintenance positions.

The Plaintiff, an African-American male, began working for the Defendant in 1979. In November 1995, he suffered a penetrating wound to his left eye while clearing thorny brush as part of his job duties. His left eye was rendered aphakic, meaning it did not have a natural lens. The Plaintiff received an aphakic contact lens, which allowed him to obtain 20/25 to 20/30 vision. The Plaintiff returned to work in June 1996. Upon his return, he presented a note from his ophthalmologist, Barbara Schroeder, M.D., releasing him to return to work "with restriction of wearing contact lenses and glasses." (6-24-96 Note, DE 27-4.) Even though the note did not mention any other restrictions, the Plaintiff maintains that he spoke to Bill Etzler, the Director of the Highway Department, and Jim Thomas, his direct supervisor, about additional restrictions. He told them that his eye condition would make it problematic to operate a chain saw, an Athey machine, and a steel tire roller. According to the Plaintiff, Etzler and Thomas were willing to accommodate him, and for the next ten years he performed the duties of his Maintenance-I

position without being required to perform these duties. (It is not clear from the record whether he was specifically excused from these duties at times when he would have otherwise been required to perform them, or if the performance of these tasks simply never arose during the normal course of his job.) Despite the Plaintiff's agreement with Etzler and Thomas, the only documentation kept in the Plaintiff's personnel file was Dr. Schroeder's release noting his restriction of wearing contact lenses and glasses.

In July 2005, Alan Gull became the Field Supervisor at the maintenance facility (referred to as the South Barn) from which the Plaintiff operated. Gull did not have any knowledge of the Plaintiff's 1995 workplace injury or any restriction that resulted from the injury.

In late February 2006, the Plaintiff was assigned to a brush crew. Gull told the Plaintiff that he had to be out of his truck helping the brush crew with chipping and cutting brush. The Plaintiff told Gull that he could not operate a chain saw because of his eye condition. The Plaintiff maintains that Gull became angry, expressed that he did not know why the Plaintiff could not operate the saw, and told the Plaintiff that he was going to "show him" and make him run the chainsaw. (Pl.'s Dep. 86–87.) The Plaintiff testified that a note appeared on the South Barn bulletin board later that same day communicating that Maintenance-II and III workers would no longer be running the chain saw, and it would be the responsibility of Maintenance-I workers. Gull states in his Affidavit that when the Plaintiff refused to operate the chainsaw, he simply told the Plaintiff that he would look into it.

According to the Plaintiff's deposition testimony, he was then "singled out" to run the chain saw when Rick Rhymer, his foreman, told him he would have to run the chain saw, and later when Jeff Sorg, the Manager of Highway Operations, told him he would be running the

chain saw. (Pl.'s Dep. 87–88.) The Plaintiff provided the following testimony on this point:

> Q. Did they say why you had to run the chain saw?
> A. No, they didn't say why.
> Q. Who else worked with you on the brush crew usually?
> A. Different guys worked on it.
> Q. Were there ever brush crews that you weren't on?
> A. Yes.
> Q. And, Maintenance Worker I's were asked to run the chain saw in those crews too, is that right?
> A. I don't know. We all worked together.

(Pl.'s Dep. 88.)[1] The chain saw would not become an issue again until over seven months later, in October 2006. However, a short time later, the Plaintiff did have trouble with his contact lens while performing another task.

On March 2, 2006, the Plaintiff was operating a chipper as part of his maintenance job. The Plaintiff normally wore his safety glasses with side shields while performing his maintenance duties, but for the chipper task he wore employer-provided goggles that fully covered his eyes. He took the goggles off when they began to fog and to dry out his contact lens. He then rubbed his eyes causing his lens to become scratched. Although the Plaintiff did not damage his eye, he had to replace the aphakic lens.

---

[1] The Plaintiff cites deposition pages 87–88 in support of his statement of fact that he was singled out to run the chain saw, and that he was "the only worker specifically required to run the chain saw; normally, individuals were assigned to crews rather than to specific duties." (Pl.'s Resp. 8.) The cited deposition testimony does not indicate that the Plaintiff was charged with operating the chain saw outside of the times that he was assigned to a brush crew, that operating the chain saw was the only task he was allowed to do while working as part of a brush crew, or that others on the crew were not also expected to run the chain saw. Because the Plaintiff admits that he does not know what happened on brush crews to which he was not assigned, the Plaintiff cannot affirm whether other workers were specifically asked to operate the chain saw or perform other specific tasks. Moreover, there is no evidence in the record showing that other workers refused to run the chain saw (such that they would have been specifically directed by a supervisor to do so), or that others were exempt from running the chain saw. The reasonable inference from the evidence, viewed in a light most favorable to the Plaintiff, is that his refusal to operate a chain saw prompted a supervisor's declaration that all Maintenance-I workers would operate chain saws while they were assigned to a brush crew, and that this was specifically communicated to the Plaintiff because he had refused to perform this duty. The evidence does not support the conclusion that the normal procedure of assigning workers to crews was eliminated or altered with regard to the Plaintiff. In fact, the evidence is that it was followed.

On March 15, Dr. Schroeder wrote a note indicating that she had examined the Plaintiff, that he needed to wear a contact lens in his left eye to get any vision, and that it was "very difficult to work in dirty/blowing conditions." (3-15-06 Note, DE 27-6.) She also sent Jeff Sorg a letter in response to the Plaintiff's request that she communicate to Sorg the Plaintiff's situation as it related to his vision and lens. She explained that the Plaintiff's left eye was aphakic, meaning he did not have a natural lens, but that with correction his vision was 20/20 in his right eye and 20/30 in his left eye. She opined that he should not work without his left lens in place. Dr. Schroeder noted that the Plaintiff described being frustrated that goggles provided at work fogged up, but that if he does not wear them, debris and dust make his contact lens so irritated that he has to replace it frequently and is unable to work at times because of the irritation. She concluded:

> This is certainly a problem for contact lens-wearers and Jerry definitely needs to wear his contact lens to be able to work. I suggest that perhaps alternative goggle-types could be tried or perhaps there is some type of work environment that would have less dust in the air to which he could transfer.

( 3-15-06 Note, DE 27-5.)

On March 20, Sorg wrote an inter-office memorandum to the Plaintiff regarding his contact lens. Sorg summarized Dr. Schroeder's suggestions for alternative goggles or change in his work environment. He explained that highway work was, by its nature, "a somewhat dusty environment" and reminded the Plaintiff that his job description required him to work in conditionsw that may be "somewhat dirty and dusty."[2] Sorg explained that light duty was not an

---

[2] The job description for Maintenance-I workers provides: "Working Conditions: Incumbent performs the majority of duties outdoors, with exposure to inclement weather, dust, grease, fumes, and dirt associated with heavy maintenance and construction operations and road repair." (Harmtan Aff., ¶ 19, Ex. A, DE 23-5.) The Maintenance-II and III job descriptions contain similar statements about dusty and dirty working conditions.

option. Regarding Dr. Schroeder's suggestion regarding goggles, he wrote that the Plaintiff's supervisor, Ben Ridenour, had researched new or improved goggles after the Plaintiff made his supervisors aware of his problems with the previously-provided goggles in early March, and that Ridenour found goggles that the manufacturer claimed performed better than the goggles the Defendant had been purchasing. Sorg informed the Plaintiff that the Defendant had ordered the new goggles and that they would be available for his use, stating that "[h]opefully this will solve your problem." (3-20-06 Memo, DE 27-7.)

For about the next seven months, the Plaintiff was not asked to operate a chain saw, and he performed the duties of his Maintenance-I position without any issues. However, he did not try wearing different goggles. In October, the Plaintiff refused to run the chain saw while he was on the brush crew. This corresponds to the time period, fall 2006, when Sorg and Ridenour started receiving complaints from maintenance workers that some of the guys were refusing to get out of their trucks and do the harder, dirtier work, like operating the chain saw. In response, Sorg and Ridenour instructed the foreman who supervised the maintenance workers that all workers assigned to brush and tree trimming crews had to trade and rotate jobs throughout the day so that each worker would spend some time both driving the truck and running the chain saw. They also reviewed the Plaintiff's personnel file to locate any documents showing a restriction for avoidance of dust or dirt. The only note they found was the Plaintiff's initial return to work slip that referenced the Plaintiff's need to wear contact lenses and glasses.

According to the directive from Sorg and Ridenour, on October 17, Rick Rhymer, the Plaintiff's foreman, instructed the workers on the brush crew, which consisted of mostly Maintenance-I workers, that they had to rotate duties with everyone taking a turn at operating the

chain saw. The Plaintiff again refused to run the chain saw because of the dusty conditions it created. Rhymer told the Plaintiff that being around dust was part of his job, and the Plaintiff responded that he could not do it. Rhymer informed Sorg of the Plaintiff's refusal.

In response, Sorg conducted a meeting with Rhymer and the Plaintiff. Rhymer relayed the events that transpired, and the Plaintiff agreed with Rhymer's statement. The Plaintiff complained to Sorg that the eye protection provided by the Defendant dried his eyes and that he could not wear it. Sorg told the Plaintiff that he could not find any papers in his file that supported the Plaintiff's claimed restrictions and asked the Plaintiff to provide such papers. The Plaintiff went home to locate paperwork, but could not find it and returned to work without any documentation. He then asked to take half a sick day, which was granted.

The Plaintiff immediately obtained from Dr. Schroeder a note, which stated that he was required to wear a contact lens and was "not able to tolerate an environment with dust or debris and my recommendation is that he <u>avoid</u> dust and debris." (10-18-06 Note, DE 27-9) (emphasis in original). After receiving the note about avoiding dust and debris, Sorg considered whether another position would present less dusty conditions, and concluded that all of the maintenance positions required work to be done in dusty, dirty, and blowing conditions. It was Sorg's opinion that the typical lower maintenance level assignments actually involved more dust. Therefore, he decided that a transfer to another position, even if one was open, would not solve the problem. Sorg determined that the best solution was to try to find personal protective equipment that would shield the Plaintiff's eyes from dust and flying debris. Ridenour agreed with this approach given the vast number of duties that involved dirty, dusty, and blowing conditions.

On October 30, Sorg made several phone calls to local retailers of personal protective

equipment, and located two stores that purported to have a good supply of equipment. Sorg instructed Gull to take the Plaintiff to these stores to try on different equipment and to purchase any that seemed workable. On November 2, Gull took the Plaintiff to the stores. Gull told the Plaintiff that their mission was to find a solution, and that if he found suitable glasses, goggles, or a mask, the Defendant would purchase it no matter the cost. The Plaintiff did not find any equipment that he believed to be better than his current goggles. Gull also took the Plaintiff to stores in search of protective equipment on two other occasions: November 8, and December 14. Both of these trips were unsuccessful and, in one instance, the Plaintiff refused to try a piece of equipment on at the store. Additionally, Ridenour arranged for the Department to purchase a full-face respirator that the Defendant's risk manager had located through his research, but the Plaintiff never wore it in the field.

On November 6 and 9, the Plaintiff's supervisor instructed him to operate the chain saw while working on a brush crew. Both times, the Plaintiff refused, citing his contact lens. The Plaintiff was written up for insubordination and suspended three days for the first write-up and five days for the second. After the two suspension were issued, the Director of Human Resources, Brian Dumford, became involved. Because Dumford was not certain whether the Plaintiff was disabled under the ADA and did not want to risk violating his rights, but also because he needed to investigate further, he rescinded the suspensions. Dumford arranged a meeting between management and the Plaintiff to discuss his restrictions. Dumford, Sorg, and Ridenour all testified that they discussed what the Plaintiff could and could not do. Dumford and Ridenour testified that they discussed the Plaintiff's suggestion that he perform the functions of his position by simply driving his truck for most of the time and not being required to do tree

trimming, brush work, or other manual jobs that would expose him to dust and flying debris. The Plaintiff maintains that he never communicated that "he could not perform any task that exposed him to any amount of dust and debris," and highlights that for ten years he performed many jobs that exposed him to dust and dirt without incident, and that it "was only jobs that created excessive dust and debris, specifically the chainsaw, that presented unreasonable risks." (Pl.'s Resp. 5.) He also disagrees that he proposed that he simply drive the truck all of the time—he claims his suggestion was that he be allowed to continue what he had been doing, but be exempt from running the chain saw and perhaps the steel tile rower. Although it is not clear from the record what the Plaintiff communicated to management at the November 14 meeting, the evidence supports the conclusion that the only task he specifically refused to perform throughout his employment was running the chain saw. The Court also assumes as true for purposes of summary judgment that the Plaintiff did not suggest that he simply stay in the truck as a solution to his problem.

At the end of the November 14 meeting, Dumford gave the Plaintiff a written request for clarification of his physical restrictions as they related to the Maintenance-I position, specifically regarding Dr. Schroeder's most recent restriction that he "avoid dust and debris." The Defendant attached a copy of the Maintenance-I job description, asked the Plaintiff to review it with his doctor to receive guidance on which duties he may or may not be able to perform with his restrictions, and advised that the Defendant would discuss the possibility of accommodations upon receiving such clarification.

The Plaintiff took the job description to his doctor, and on November 24, Dr. Schroeder wrote that, although she reviewed the job duties, she could not "specify every situation that

might generate enough dust and debris to be a problem" for the Plaintiff's aphakic contact lens. (11-24-06 Note, DE 27-13.) She indicated that there were "jobs which <u>could</u> be performed" by the Plaintiff, but that a supervisor would need to look at each task and determine if there was an "intolerable amount of dust and debris." (*Id.*) (emphasis in original). She opined that, in some instances, the Plaintiff could try a given duty and then let his supervisor know if the dust was "intolerable." (*Id.*)

After receiving Dr. Schroeder's November 24 letter, Dumford scheduled another meeting, this time to determine which job duties and functions involved working in dusty conditions. On December 5, Dumford, Sorg, Ridenour, the Plaintiff, and another Maintenance-I worker whom the Plaintiff invited, met to discuss the job functions. The Plaintiff maintains that when he arrived at the meeting, a paper with the Maintenance-I job description was already marked with each duty designated as dusty or not dusty. Seven out of the ten listed duties were marked as dusty. All those in attendance at the meeting signed the marked job description. The record is silent as to what the Plaintiff expressed about the designations at the time of the meeting.[3] Dumford told the Plaintiff that it was not reasonable for him to be excused from all dusty and blowing conditions, and that the Plaintiff needed to work with the Defendant to find protective equipment or some other solution. He warned the Plaintiff that if a reasonable solution was not reached, he could lose his job for his inability to perform the essential functions of his job. Dumford instructed the Plaintiff's supervisors that they needed to continue searching for equipment that would allow the Plaintiff to perform his job.

---

[3] The Plaintiff contends in his Response that he verbally disagreed with these categorizations (Pl.'s Resp. 10), but the deposition testimony designated in support of this fact is not testimony about what happened during the December 5 meeting.

As the Defendant continued to work with the Plaintiff to find personal protective equipment, the Plaintiff continued to assert that none of the equipment was suitable, and he did not approve of or wear any new equipment in the field. A final meeting was held with the Plaintiff on January 5, 2007. Dumford told the Plaintiff that the Defendant had attempted to find a suitable solution that would allow him to avoid dust and debris, but that the Plaintiff had refused all suggested and provided personal protective equipment. Dumford asked the Plaintiff whether he would cut brush, trim trees, and use a chipper and chain saw from time to time as those tasks were assigned to him. The Plaintiff responded that he would refuse to perform such work. The Defendants then decided to terminate the Plaintiff's employment, and he was advised in a letter from the executive director of the Highway Department that the Defendant was seeking termination of his employment. The letter stated that it had been determined that the Plaintiff was no longer able to perform the essential functions of his position, which included many duties that generated dusty conditions such as operating various size trucks; operating heavy equipment to construct and repair roads, culverts, bridges, and drainage structures; operating mowers; and clearing brush. The letter continued by stating that the Plaintiff's inability to work in dusty conditions severely limited his ability to perform the core duties of his position, and that to alter or remove them would fundamentally change the nature of the position.

## DISCUSSION

### A.      The Plaintiff's ADA Failure to Accommodate Claim

"Title I of the ADA, 42 U.S.C. § 12111, is devoted to eliminating employment discrimination based on actual or perceived disabilities." *Karraker v. Rent-A-Center, Inc.*, 411

F.3d 831, 834 (7th Cir. 2005). The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA also requires employers to make reasonable accommodations for the disabilities of qualified individuals. *Id.* § 12112(b)(5)(A) (stating that "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business"). The Plaintiff claims that the Defendants intentionally discriminated against him by failing to accommodate his disability. (Pl.'s Resp. 12.)

To establish an ADA failure-to-accommodate claim, a plaintiff must show the following elements: (1) he is a qualified individual with a disability; (2) his employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). The Plaintiff argues that he meets the first two elements because the Defendants regarded him as having an impairment that substantially limited him in the major life activity of working when they believed that he was unable to work in dusty and dirty environments, as opposed to his actual limitation from working in conditions that involved "excessive" amounts of blowing dust and debris. The Defendants counter that they relied on the Plaintiff's own comments and his physician's notes to determine the scope of the Plaintiff's claimed limitations and any required accommodation, and that, on the basis of this information, they only regarded him as unable to fulfill the job duties of a maintenance worker

for county highways. The Defendants also submit that they did not actually credit the Plaintiff's protests and claimed limitations, but regarded him as fully able to perform the functions of his position.

As to the third element, the Plaintiff contends that the Defendants did not make a good faith effort to accommodate him when they tried to make him wear goggles instead of excusing him from operating a chain saw and other specified pieces of equipment that would create blowing dust or debris. The Defendants maintain that they fulfilled their obligations under the ADA by providing the Plaintiff with new safety goggles and a full-face respiratory to shield him from dust and debris. The Defendants argue that it was not reasonable to permanently excuse the Plaintiff from operating a chain saw, which is an essential function of brush removal, or from operating other equipment on the subjective grounds that they created excessive blowing.

Because this Court finds that the Plaintiff cannot meet the third element of a failure to accommodate claim, the Court need not decide whether the Defendants perceived the Plaintiff as disabled for purposes of the ADA, and the Court will assume, for purposes of this decision, that the Plaintiff was disabled as defined by the ADA. As part of the reasonable accommodation duty, the ADA requires employers to engage in an interactive process with disabled employees needing accommodation so that together they can identify the employee's needs and discuss accommodation options. *Emerson v. N. States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001). "An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Both parties bear responsibility for determining what accommodation is necessary. *Id.* If an employer fails to engage in the interactive process or causes the process to

breakdown, and that breakdown leads to the employer's failure to provide a reasonable accommodation, the employer is liable under the ADA. *Emerson*, 256 F.3d at 515; *see also Rehling v. City of Chi.*, 207 F.3d 1009, 1016 (7th Cir. 2000) (emphasizing that an employer's failure to engage in the interactive process is only actionable if it resulted in a failure to provide a reasonable accommodation for a qualified individual).

There can be no dispute in this case that the Defendants engaged in the interactive process with the Plaintiff. The decisive issue is which party was responsible for the breakdown in the process, ultimately leading to the termination of the Plaintiff's employment. The Seventh Circuit has provided the following guidance to courts regarding the designation of fault when there is a breakdown:

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Here, the interactive process was underway when the Defendant sought clarification from the Plaintiff and his doctor regarding his restrictions and provided a job description to aid in this task. The Defendant, a long time maintenance worker, was certainly in a position to describe his own job duties to his doctor, including how much dust they created. Yet, the only response to the request for clarification was that it would be permissible for the Plaintiff to perform "some" of the duties of his position and that a try-and-see approach should be used to determine which duties would create intolerable conditions. Unable to arrive at or obtain any objective criteria

from the Plaintiff, it was reasonable for the Defendant to suggest that he try different eye wear for situations and tasks that the Plaintiff himself determined were too dusty. The Plaintiff was not entitled to ignore his employer's reasonable suggestion out of hand because an employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation. *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). "It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (citing cases); *cf. Schmidt v. Methodist Hosp. of Ind., Inc.*, 89 F.3d 342, 344 (7th Cir. 1996) ("Reasonable accommodation does not require an employer to provide literally everything the disabled employee requests.").

The Plaintiff argues that the "Defendants' proposed accommodation of different/better goggles was not reasonable" (Pl.'s Resp. 18 ) because it was "'obviously doomed to fail from the start,'" (*id.* 19 (quoting *EEOC v. Huminston-Keeling, Inc.*, 227 F.3d 1024, 1026 (7th Cir. 2000)).[4] The Plaintiff cites Dr. Schroeder's March 15, 2006, letter as evidence that the Defendants should have known that different goggles would not help the Plaintiff and that goggles actually "prevented [him] from being able to perform his job duties." (Pl.'s Resp. 19.) The Plaintiff, presumably, is referring to the portion of Dr. Schroeder's letter that describes the Plaintiff's frustration with his goggles fogging up. Dr. Schroeder's letter, however, does not

---

[4] In *Huminston-Keeling*, the employer's first (and unsuccessful) attempt at an accommodation for an employee with tennis elbow in her right arm was to rig an apron in such a way that the employee could carry items with just her left arm. The Seventh Circuit rejected the EEOC's claim that the "one-arm picker" was not "meaningful," stating that failed experiments taken in good faith and not obviously doomed to fail from the start should not be discouraged by deeming them unreasonable per se. 227 F.3d at 1026.

foreclose any and all goggles or other personal protective equipment as an appropriate accommodation. In fact, one of the two solutions Dr. Schroder specifically proposed to the Plaintiff was to try different goggles: "I suggested that perhaps alternative goggle-types could be tried or perhaps there is some type of work environment that would have less dust in the air to which he could transfer." (3-15-06 Letter, DE 27-5.) Based on the information they possessed, the Defendants sought better personal protective equipment, soliciting the aid of the Plaintiff in the task so he could approve any equipment or help find another solution that did not entail being excused from all duties involving dusty and blowing conditions.

The Plaintiff's argument that the suggested accommodation was doomed to fail from the start loses further force when it is considered in the context that the Plaintiff only tried one pair of goggles before he determined that no personal protective equipment could provide sufficient protection without drying out his contact lenses. He tried none of the equipment offered after the parties began the interactive process. When the Defendants offered and took affirmative steps to supply other brands of eye wear and other types of protection (with no limit for financial cost) the Plaintiff refused to try this equipment while performing job duties, even those that he claimed were not problematic for the amount of dust they created. There would have been no risk of harm to the Plaintiff in experimenting with new equipment while performing one of the numerous tasks that the Plaintiff maintained did not cause excessive dust or debris. The Plaintiff failed to make reasonable efforts to help the Defendants determine what accommodations would be effective and thereby caused the breakdown in the interactive process. Moreover, because he never tried the suggested accommodation, there is no evidence in the record from which a jury could conclude that the accommodation the Defendants offered would not effectively

accommodate the Plaintiff's need to avoid excessive dust and debris from getting into his eye.

**B.**     **The Plaintiff's Race Discrimination Claim**[5]

The Plaintiff claims that the Defendants discriminated against him on the basis of his race when they terminated his employment instead of demoting him. He provides the following evidence in support of this claim. First, when Jimmy MacDonald, a caucasian Maintenance-I worker, lost his CDL license and was thus unable to perform the duties of the Maintenance-I position, the Defendants demoted him to Maintenance-II, which does not require a CDL. Second, Dennis Coplen, another caucasian, was demoted from a supervisory position to a Maintenance-I worker after he became ill.

The Plaintiff argues that because these employees were afforded the option of a demotion after they could no longer perform their job duties, but he was not, he has established a *prima facie* case of race discrimination. The Plaintiff is relying on the indirect burden-shifting method of proof explained in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, the Plaintiff must first establish a *prima facie* case of discrimination by proving the following: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).

Because the Plaintiff fails to raise any genuine issue of fact for trial on the fourth element, the Court need not discuss the other elements of a *prima facie* case. *See Traylor v.*

---

[5] The Court analyzes the Title VII and 42 U.S.C. § 1981 claims together because they require the Plaintiff to prove the same *prima facie* elements. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 589 n.4 (7th Cir. 2009).

*Brown*, 295 F.3d 783, 790 (7th Cir. 2002) (holding that a plaintiff's failure to establish one element of *prima facie* case, even if she has established all of the others, was enough to support a grant of summary judgment for her employer). To establish a *prima facie* case of discrimination, the similarly-situated employees who were treated better must be directly comparable to the Plaintiff in all material respects. *Ineichen v. Ameritech*, 410 F.3d 956, 960 (7th Cir. 2005). "This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there were no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" *Id.* at 960–61 (ellipsis in original) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)).

The Plaintiff contends that MacDonald was similarly-situated because he became unable to perform the duties of his Maintenance-I position when he lost his CDL. This disqualifying factor, not having a CDL, applies only to the Maintenance-I position. Because an employee can perform the duties of the Maintenance-II position without a CDL, a demotion solved the specific problem created by MacDonald's inability to obtain a CDL. The Plaintiff has not presented any evidence that he requested a demotion and does not attempt to articulate how a demotion would have helped him perform his duties or how it would have avoided the need to perform the discrete tasks of operating a chain saw, a steel roller, or an Athey machine. The Plaintiff does not identify the decision-makers for either MacDonald or Coplen and does not even claim to know the circumstances surrounding Coplen's move from being a supervisor to a maintenance worker. (Pl.'s Dep. 158) ("I wonder why he couldn't continue doing his job. . . . I don't know what the circumstances was [sic]."). Moreover, Coplen was not even a maintenance worker, but a

supervisor.

Considering the record before the Court, the facts regarding the employment decisions involving MacDonald and Coplen are much too sparse to conclude that there were no differentiating or mitigating circumstances regarding their inability to perform job duties that would distinguish the Defendants' different treatment of them. The facts that are presented suggest that they were not similarly-situated: MacDonald because his limitation only impacted the duties of a Maintenance-I worker; and Coplen because he was a supervisor. The Plaintiff has thus failed to come forward with evidence that similar-situated employees outside the protected class were treated more favorably and has failed to establish a *prima facie* case of discrimination. The Defendant is entitled to summary judgment on the Plaintiff's claims of race discrimination under Title VII and § 1981.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment [DE 21] is GRANTED. The Clerk is directed to enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on August 26, 2009.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT